## Case No. 15,465.

### UNITED STATES v. The JAMES MORRISON.

[Newb. 241; [1] 4 N. Y. Leg. Obs. 333; 6 Pa. Law J. 132.]

District Court, D. Missouri. March, 1846.[2]

CONSTITUTIONAL LAW—REGULATIONS OF COMMERCE—STEAM PASSENGER VESSELS—FERRY BOATS.

1. The act of congress, approved July 7th, 1838 [5 Stat. 304], "To provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam," is founded upon article 1. § 8. cl. 3 of the constitution, giving congress power "to regulate commerce with foreign nations, and among the several states," &c.

2. If commerce is completely internal, confined to one state, congress has no power over it.
[Cited in U. S. v. The Seneca, Case No. 16,-251. Distinguished in The Daniel Ball, Id. 3,564.]

3. Congress has no authority to require a license to carry on a ferry over the Missouri river, at a place entirely within the limits of the state of Missouri.

4. There is no law previous to the act of July 7th, 1838, requiring a ferry boat plying wholly within the limits of a state, to obtain a license.

5. The act of 7th of July, 1838, does not apply to such ferry boats.
[Cited in U. S. v. The Planter, Case No. 16,-054. Followed in U. S. v. The William Pope, Id. 16,703.]

6. Whether ferry boats plying between the United States and Canada, would be required to obtain a license. Quere?

7. The phrase "coasting trade," cannot be applied to ferrying across a river.
[Cited in Ravesies v. U. S., 35 Fed. 919.]

In admiralty.

B. F. Hickman, for the United States.
S. M. Bay, for the James Morrison.

WELLS, District Judge. This is a case of libel. It is founded on the second section of the act of congress, entitled "An act to provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam," approved 7th July, 1838. The libel states substantially, that the boat was propelled by steam, and was employed in navigating the Missouri river, a navigable river of the United States, and in transporting goods, wares and merchandise, and passengers in said boat on said river, without the owners having obtain-

ed a license from the proper officer of the United States so to do, and charges that said boat was liable to a penalty of $500. The owners appeared and defended. The answer admits that the boat was propelled by steam, that it navigated the Missouri river, as charged, but denied that it navigated or transported freight and passengers in any other manner than as a ferry boat across said river at St. Charles, altogether within the limits of the state of Missouri, for which purpose they had a license under the laws of the state of Missouri. They admit that they had no license from the United States; but deny that one was necessary, or that they incurred any penalty. From the evidence and the admission of the parties, it appears that the facts of the case were correctly stated in the answer.

Upon this state of facts an important question arises for the consideration and determination of the court. Is a steamboat employed only as a ferry boat, altogether within the limits of a state, liable to a penalty for being thus employed, not having a license from the United States officer, under the provisions of the act of 7th of July, 1838? The first and second sections of that act are as follows:

"Section 1. That it shall be the duty of all owners of steamboats or vessels propelled in whole or in part by steam, on or before the first day of October, 1838, to make a new enrollment of the same under the existing laws of the United States, and to take out from the collector or surveyor of the port, as the case may be, where such vessel is enrolled, a new license, under such conditions as are now imposed by law, and as shall be imposed by this act.

"Sec. 2. That it shall not be lawful for the owner, master or captain of any steamboat or vessel propelled in whole or in part by steam, to transport any goods, wares and merchandise or passengers in or upon the bays, lakes, rivers, or other navigable waters of the United States, from and after the first day of October, 1838, without having first obtained from the proper officer a license, under the existing laws, and without having complied with the conditions imposed by this act; and for each and every violation of this section, the owner or owners of said vessel shall forfeit and pay to the United States the sum of five hundred dollars, one-half for the use of the informer; and for which sum or sums the steamboat or vessel so engaged shall be liable, and shall be seized and proceeded against, summarily, by way of libel, in any district court of the United States having jurisdiction of the offence."

The words of the act are comprehensive enough to include the case of this boat. It is propelled by steam, navigates a navigable river of the United States, transports goods, wares and merchandise and passengers upon said river, and has no license therefor from the proper United States officer.

It is not uncommon for a case to come within the words of an act, yet not come within the meaning of the. act. It will be observed that the first section requires a "new enrollment" under the existing laws of the United States, and a new license taken out. The second section requires a license to be taken out under the existing laws. No license is spoken of. mentioned or described, other than that required theretofore. It is obvious that the license spoken of in the act is that prescribed by other and former laws of the United States, and could only be "a license to carry on the coasting trade." no other license known to the laws of the United States being at all applicable. This was admitted by the district attorney of the United States in the argument at the bar.

I will first inquire into the constitutional power of congress to require a license in this case, and then, secondly, to inquire whether, supposing the power to exist, it has been extended by the act of 1838 to this case. Even if we were to confine our inquiries to the second branch of the subject, it would greatly aid us in making those inquiries to ascertain the power of congress over the subject.

It is said in Sergeant's Constitutional Law, page 308, that "the general power of establishing regulations for the condemnation of vessels as unfit for sea or unworthy of repair, may, it would seem, be exercised by congress, either as applicable to trade and commerce, or as within the admiralty jurisdiction." And the supreme court of the United States in the case of Janney v. Columbia Ins. Co., 10 Wheat. [23 U. S.] 418, said something, arguendo, to the same effect. The admiralty jurisdiction is a part of the jurisdiction of the courts, and is found in the third article. section second. of the constitution of the United States: "The judicial power shall extend to all cases of admiralty and maritime jurisdiction." But the supreme court decided in the case of U. S. v. Combs, 12 Pet. [37 U. S.] 76, that "in cases dependent on the locality of acts done, this power is limited to the sea and to tide-waters as far as the tide flows, and does not reach beyond high-water mark." Of course that jurisdiction could not reach a transaction the locality of which was some thousands of miles above tide-water; for in this case the jurisdiction would depend upon the locality of the transaction. But the provisions of the act of 1838 are evidently founded on the power of congress to "regulate commerce." The license required is "to carry on the coasting trade," and the power was claimed. in the argument at the bar, under the clause "to regulate commerce." It was not claimed under the admiralty and maritime jurisdiction. The constitution, in article 1, § 8, cl. 3, declares that congress shall have power "to regulate commerce with foreign nations and among the several states and with the Indian tribes." The authority of congress, as it regards the case at bar, is claimed under the power to regulate "commerce among the several states."

The power over navigation and intercourse is part of the power to regulate commerce, and is possessed by congress as fully as it possesses the power to regulate commerce; but, of course, not to a greater extent. There is no separate and distinct grant to regulate navigation or intercourse; they are incidents to or part of the power to regulate commerce. Wherever the right to regulate commerce does not extend, the right to regulate navigation or intercourse does not go. The latter goes with the former or follows it. The right to regulate commerce only extends to three descriptions of commerce: First, with foreign nations; second, among the several states; third, with the Indian tribes. It does not include the perfectly internal commerce of a state. The commerce to be subject to such regulations must be among, that is intermingled with, the several states. If confined to one state alone, congress has no power over it. It would have been strange if it was intended that congress should have power to regulate every description of commerce. to enumerate only particular kinds in the grant. And such are the doctrines and opinions of the supreme court. In Gibbons v. Ogden, 9 Wheat. [22 U. S.] 194, that court says: "It is not intended to say that these words comprehend that commerce which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states. Such a power would be inconvenient, and is certainly unnecessary." Again: "Comprehensive as the word 'among' is, it may be properly restrained to that commerce which concerns more states than one. The phrase is not one which would probably have been selected to indicate the completely internal traffic of a state, because it is not an apt phrase for that purpose, and enumeration of the particular classes of commerce to which the power was to be extended would not have been made had the intention been to extend the power to every description." Id. 194, 195. Again: "The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally." Id. 195. Again: "The completely internal commerce of a state, then, may be considered as reserved for the state itself." Id. This, also, is the doctrine maintained by the highest court of the state of New York. See Steamboat Co. v. Livingston, 3 Cow. 754.

Is the right of congress to regulate navigation more extensive than the right to regulate commerce? Does it extend to the regulation of navigation, which is not connected with "commerce with foreign nations, among the several states, and with the Indian

tribes?" The supreme court of the United States in Gibbons v. Ogden [supra] said, "A power to regulate navigation is as expressly granted as if that term had been added to the word 'commerce.'" This sentence was commented on in the argument at the bar, as. if the supreme court intended thereby to convey the idea, that congress had the right to regulate navigation in all cases. It could not have an application so extensive, because, if navigation be comprehended in the word "commerce," it is limited with the limitations on that word; but suppose we add the word "navigation" to the word "commerce," as the court supposes may be done, it will then read, "Congress shall have power to regulate commerce and navigation with foreign nations, and among the several states, and with the Indian tribes." So we see that still, congress could only regulate navigation, when it could regulate commerce, that is, as it regards this case, "among the several states." And, indeed, it is clear that the supreme court must have intended to convey this idea; for in another part of the same opinion, it says: "The power of congress, then, comprehends navigation within the limits of every state in the Union, so far as that navigation may be, in any manner, connected with 'commerce with foreign nations, or among the several states, or with the Indian tribes.'" And in the case of U. S. v. Combs, 12 Pet. [37 U. S.] 78, that court says: "The power to regulate commerce includes the power to regulate navigation as connected with the commerce with foreign nations and among the several states."

The next matter of inquiry will be, what is that commerce or navigation, which is completely internal or within the limits of a state. To make a particular branch of commerce or trade within a state, a part of the commerce among the several states, it would not be sufficient. that it was remotely connected with that commerce among the several states; for almost everything and every occupation and employment in life are remotely connected with that commerce or navigation. And if congress has the right to regulate every employment or pursuit thus remotely connected with that commerce, of which they have the control, then it has the right to regulate nearly the entire business and employment of the citizens of the several states. Thus the cultivation and preparing of hemp, tobacco, cotton, rice, grain, &c., finding and preparing minerals, the manufacturing and retailing of goods, are all connected with "commerce with foreign nations, among the several states, or with the Indian tribes;" because they are the food of that commerce, without which, it would soon dwindle into insignificance, if it did not altogether perish. Yet, if congress has the power to regulate all these employments, and a thousand others equally connected with that commerce, then it can regulate nearly all the concerns of life, and nearly all the

employments of the citizens of the several states; and the state governments might as well be abolished. It is not sufficient, then, that navigation, or trade, or business of any kind, within a state, be remotely connected, or, perhaps, connected at all with "commerce with foreign nations, or among the several states, or with the Indian tribes," it should be a part of that commerce, to authorize congress to regulate it.

The "coasting trade" is a part of the commerce among. the several states; and it is not the less a part of that commerce, because the vessel navigates only from port to port, in the same state, up and down a navigable river of the United States, and never goes beyond the state boundary. This will appear more plain upon looking at the course of trade in the United States, upon its great navigable rivers. Goods are purchased at Philadelphia, are brought to Pittsburgh and there shipped. These goods come from parts beyond seas, or were manufactured in the United States, and were intended for sale in Mexico, or at Independence or other place in this state. But the boat in which they are shipped only goes as far as St. Louis. There the goods are reshipped on boats more suitable for the Missouri, and are, in that boat, conveyed to Independence. There they are landed and taken in wagons (if intended for Mexico), across the prairies to that country. If intended for the valley of the Osage, they are landed at the mouth of that river, and reshipped on boats more suitable to its navigation than those ordinarily navigating the Missouri. The same observations may be made in regard to goods, or Southern produce from New Orleans. Very few boats engaged in the trade between that place and St. Louis, ascend the Missouri, and very few that ascend the Missouri ascend the Osage river. These remarks will also apply to nearly all the navigation of the valley of the Mississippi, and will apply as well to boats that carry off the produce of the country, as those which bring merchandise. The boats that navigate the Missouri and Osage rivers, seldom go beyond the limits of the state of Missouri; and yet they are as much and as altogether employed in commerce and navigation among the several states, as if they made voyages beyond the limits of the state. The circumstance that several boats are employed, some without and some altogether within a state, does not make it the less "commerce" among the several states, or less "commerce with foreign nations," or in many cases. "with the Indian tribes." The commerce is a whole, parts of which are in several states. If congress cannot regulate it in one state, it cannot, for the same reason regulate it in another state. And thus it could not be regulated by congress at all, although it is undeniably commerce among the several states. And, in my opinion, it would be the destruction of this commerce, if each state in the Union through which it passed,

had the right to license vessels employed in carrying it on, and to exclude all except those thus licensed, merely because those vessels did not navigate beyond the limits of the state granting the license.

In Gibbons v. Ogden the supreme court says "commerce among the several states" cannot stop at the boundary line of each state. But, although commerce with foreign nations, among the several states, and with the Indian tribes, will include commerce and navigation up and down the navigable rivers of the United States, as part of the coasting trade, yet there is, undoubtedly, a description of commerce and navigation, that is altogether and completely internal, which belongs exclusively to the states, respectively; and which congress has no right to regulate. In the case of Gibbons v. Ogden the supreme court says: "It is not intended to say that these words comprehend that commerce which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states." Again, comprehensive as the word "among" is, it may properly be restricted to that commerce which concerns more states than one. The court of last resort, in New York, laid down the same principles, as will be presently seen. Steamboat Co. v. Livingston, 3 Cow. 743.

The next matter of inquiry will be, is a boat employed only in ferrying across the Missouri river, altogether within the limits of the state of Missouri, engaged in commerce or navigation, the instrument of commerce with foreign nations, among the several states, or with the Indian tribes? If this be answered in the negative, then congress has no right to regulate any commerce or navigation it may be employed in, or to require it to take out a license therefor; and this will be so, although the boat does in some sense navigate the Missouri, a navigable river in the United States. It is not supposed that a boat so employed is engaged in commerce with foreign nations or with Indian tribes. Is it, then, engaged in carrying on commerce among the several states? Is it engaged in carrying on any commerce at all? Is the navigation in which it is engaged an instrument to carry on commerce among the several states? It neither passes up or down the river, and may navigate a year without being twenty feet higher up or lower down, at any time, unless by accident or against the will of the master or owner, than it was at the beginning. Its navigation is neither the beginning, middle or end, or any part of the coasting trade, or any other "commerce among the states." No part of its employment is any part or any link in a chain of "commerce among the several states." Its employment has no other than a remote connection with "commerce or navigation among the several states;" no more connection than has the farmer who cultivates hemp, tobacco or cotton for a market in other states—the miner who digs and smelts lead—the manufacturer who manufactures for the same market, or the traveler who intends purchasing any of these articles. The employment of such boat may be connected with commerce or navigation "among the several states," as indeed is almost every business and avocation in life, more or less remotely; but it is no part of such commerce or such navigation. If it be any part of any commerce, it is that commerce which is altogether internal, as it regards the state of Missouri and other states. Its navigation is wholly disconnected with any other navigation, and is wholly within the state. If the commerce or navigation in which it is employed, be not wholly internal—if, indeed, it be engaged in any commerce—then I am unable even to conjecture or imagine any description of commerce or navigation which is so. This was the opinion of a majority of the supreme court of the United States, all the court except Mr. Justice Johnson, who, perhaps, dissented, in the case of Gibbons v. Ogden, above referred to. The opinion was, however, only given arguendo; it not being a matter necessarily to be decided in the cause. The court (page 203), speaking more particularly of the state inspection laws, says: "They form a portion of that immense mass of legislation which embraces everything within the territory of a state not surrendered to the general government; all of which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a state, and those which respect turnpike roads, ferries, &c., are component parts of this mass." The doctrine thus laid down by the supreme court, is mentioned and approved both by Kent and Story; at least they do not in any way controvert or dissent from it. 2 Story, Comm. 515 and 1 Kent, Comm. 437.

The same opinion is also advanced and enforced by the court for the trial of impeachments and the correction of errors in the state of New York, in the case of Steamboat Co. v. Livingston, 3 Cow. 754. That court says: "The supreme court of the United States expressly disavows any authority in congress to interfere with the purely internal commerce and police of a state. Ferries may be subject to the acts of congress so far as they are used for carrying on the coasting trade, but those ferries which are the subject of state grant, if they can be called commercial regulations at all, belong clearly to the internal commerce of the state." Again: "Those ferries over which the state exercises its appropriate authority, are not connected with the coasting trade; they are not, in the constitutional sense, commercial regulations. But if they were, they belong to that exclusively internal commerce over which congress has no control." It

was said in the argument of the above case, that the state might establish a ferry between the cities of New York and Albany; and it was in answer, I presume, to that part of the argument that the court said: "Ferries may be subject to the acts of congress so far as they are used for carrying on the coasting trade." But the court said further, that to call such navigation a "ferry," would be an abuse of the term. As congress has the power to regulate commerce, when carried on by land as well as when carried on by water—carried on roads as well as on rivers—I will not say that it might not regulate some description of ferries, such as those between the United States and Canada, and perhaps others. But this, I think, has not been done. A ferry is nothing more than the continuation of a road, and as far as regards the authority of the state and general governments, does not differ from a toll bridge. And until it is made to appear that congress has the power to regulate the traveling on the ordinary roads of the state, and to license toll bridges, it would seem to me it could not regulate and license the ordinary ferries on those roads. For each state to regulate and license the coasting trade and exclude and admit what vessels it pleased within its limits, would be, and has been—as was seen in the controversy between New York, New Jersey, and Connecticut, in regard to the exclusive privileges granted to Livingston and Fulton by the former state—extremely inconvenient and dangerous. But for each state to regulate its ferries, has not produced and cannot, I should think, produce any inconvenience to the citizens of other states. It may be, that steam ferry boats should be regulated as directed in the act of 1838, in regard to vessels engaged in the coasting trade; but if so, the states are perfectly competent to make all such regulations and to see to their enforcement.

It was said in the argument of this cause that a license from the United States and one from the state were both necessary: that a license from the United States gave the right to navigate the river, and that from the state to land and take in passengers and freight and carry on a ferry. In the case of Gibbons v. Ogden, the supreme court said: "The word 'license' means permission or authority; and a 'license' to do any particular thing, is a permission or authority to do that thing, and if granted by a person having power to grant it, transfers to the grantee the right to do whatever it purports to authorize. It certainly transfers to him all the right which the grantor can transfer to do what is within the terms of the license." The decree in that case is: "That the license to carry on the coasting trade gave full authority to navigate the waters of the United States by steam or otherwise for the purpose of carrying on the coasting trade, any law of the state of New York to the contrary notwithstanding." Now, if carrying on a ferry is carrying on the coasting trade, a license from the United States to carry on that trade, will give the right to carry on the ferry. And of course any license from the state of Missouri would be altogether inoperative, for it could only authorize the grantee to do that which he was already authorized to do by a license from the United States; and a license from the state would be inoperative for another reason, that is that the state had no authority over the coasting trade. And that the state has no control over that trade will be seen by looking at the decision of the court in the case of Gibbons v. Ogden, before cited, pages 198, 200. If, on the contrary, the carrying on a ferry be not carrying on the coasting trade, then the United States have nothing to do with it, and the license from the state would give the authority to carry on the ferry; and of course, a license from the United States would be inoperative. So that, in no point of view, can both licenses be operative. A license to ferry, is a license to cross at a certain place, carrying freight and passengers; and if it does not give that right, it gives nothing; if it does give that right, no other license can be necessary. What would avail the right to land and take in freight and passengers, as a ferry, without the right to cross over and reland? And of what avail would be a license from the United States to navigate the river, without also the right to land. Neither the United States nor the state ever grants such useless and inoperative privileges, and no constitution can require it. What is the reason that to run a boat between Independence and St. Louis no license from the state is necessary or ever granted; and yet, to cross a river, as a ferry boat, such license is necessary and has always been required? The reason is, that one is part of the coasting trade, and the other is not. It was admitted in the argument, that such license was necessary in the one case and unnecessary in the other.

It was also said in the argument, that perhaps this power in congress may be supported under the grant, in the constitution, to lay and collect taxes. The answer may be brief. No tax is collected or collectable under the laws of the United States applicable to this case, and the act of 1838 is to prescribe and impose certain regulations, not to lay or collect a tax. I come, therefore, to this conclusion: that congress has no authority to require a license to carry on a ferry over the Missouri river, at a place altogether within the limits of the state of Missouri.

The next matter of inquiry will be, is there anything in the laws of the United States, previous to the act of 1838, which requires a boat employed only in ferrying across a river, at a place wholly within the limits of a state, to obtain a license for such employ-

ment? A person will be greatly aided in the investigation, by bearing in mind the constitutional power of congress. For if words or phrases in an act, will bear a construction which is in accordance with the constitutional power of the legislature, and one which is opposed to that power, we are bound to believe, that the legislature intended that construction which is in accordance with their power. The title of the act, which is the principal one on this subject (18th Feb., 1793 [1 Stat. 305]), is "An act for enrolling and licensing ships or vessels to be employed in the coasting trade and fisheries, and for regulating the same." The form of the license, given in the act itself, is "License is hereby granted for the said —— called the said ——, to be employed in carrying on the coasting trade." The act provides for the forfeiture of any ship or vessel, found trading between, &c.. laden with foreign goods; and for the payment of custom duties, if laden with certain goods, &c., not being registered or licensed for carrying on the coasting trade. The coast is the shore. "To coast" is to navigate along the shore. The "coasting trade," is the trade along the shore. It cannot with any propriety be applied to ferrying across a river; and never, I think, has been so applied. Neither the phrase "coasting trade," nor the word "coasting," nor "trade," could with any propriety, be applied to a ferry across a river. Congress may, and probably has, the power, to apply its laws to some description of ferries, such as those between Canada and the United States, and probably others; but I am of opinion, that none of the acts of which we are now speaking, were intended to apply to the ordinary ferries within the limits of a state.

The opinion of Mr. Justice Johnson, in (the case of) Gibbons v. Ogden, was cited by the counsel for the United States, in the argument of this case. When properly considered, there is not, I think, much in it that favors the doctrine maintained by the counsel. It had been said. in the argument of that case, that the boat which plied between New York and Albany, was only a ferry boat. Mr. Justice Johnson, in noticing that part of the argument, said that in either character—that is, as a steamboat or a ferry boat—she was expressly recognized as an object of the provisions which relate to licenses. This was certainly correct, for in either character, or by whatever name she was called, she was engaged in "carrying on the coasting trade." It only now remains to say a few words in regard to the act of 1838. It was admitted by the United States counsel, in the argument of this cause, that the license required to be taken out, by that act, was a license to "carry on the coasting trade," and was no other than that required by the laws of the United States existing theretofore. This indeed, is evident from the provisions of the 1st and 2d sections. The 1st section requires a new enrollment, a new license; the 2d section, a license "under the existing laws." If, then. a vessel be neither engaged in the coasting trade, or indeed in any trade at all, the clearest and strongest language would be necessary to require such a vessel to take out a license for such purpose. We have seen that a license is an authority or permission to carry on that trade; if it be not intended to employ a vessel in that trade, why should the owner be required by law to take out a license therefor? If the law will bear no other construction than one so unreasonable, we would be bound to suppose it was intended to have that construction; but it will bear another construction, and that is, that it was intended that vessels engaged in the coasting trade should be required to conform to additional regulations, before being allowed to carry it on. The 1st section requires boats "to make a new enrollment, and take out a new license, under such conditions as are now imposed by law, and as shall be imposed by this act." There is not a word in the act of 1838 which applies particularly to ferry boats, and not one but will apply generally to vessels engaged in the coasting trade. I infer, therefore. that it was not intended to make any such extraordinary change in the existing laws. If such a change were contemplated, many details would be necessary to confine its operation to cases within the jurisdiction of the general government. As was said by the supreme court, in Gibbons v. Ogden, in regard to the power, "it would be inconvenient, and certainly is unnecessary." Ferry boats would have to quit their station, twice a year, and go frequently several hundred miles to be inspected and licensed; a trip for which they are unfit, and which would make other boats necessary to supply their places at the ferries, creating an expense which but few ferries would justify. It would abolish all the laws of the state in regard to such ferries, and materially interfere with its police, economy and revenue. Such important changes are not usually made by mere implication or construction, and no court would, I think, be justifiable in giving the laws in this case such an interpretation. My opinion is, therefore, that the act of 1838 does not apply to the steam ferry boat, the James Morrison.

NOTE. This case was taken to the circuit court of the United States on appeal, and the judgment of the district court affirmed. [Case unreported.] A more extended reference is made to the opinion of the learned judge of the circuit court. on appeal, in the case of U. S. v. The Wm. Pope [Case No. 16,703].